AMERICAN GENERAL INSURANCE COMPANY V.
MRS. WILLIAM JONES, ET VIR.

No. A-3808. Decided February 18, 1953.
(255 S. W. 2d Series, 502)

100

*Vinson, Elkins & Weems, C. M. Hightower* and *B. Jeff Crane, Jr.,* all of Houston, for petitioner.

The Court of Civil Appeals erred in not instructing the jury to return a verdict for the defendant upon its motion timely filed before any charge was given to the jury, since there was no evidence raising an issue of fact that deceased dies as a result of accidental personal injuries sustained by him in the course of his employment, and in view of undisputed evidence showing that deceased met his death at a point about a mile and a half from the place where he had been employed to perform his duties. Said court also erred in holding that statements made by the deceased prior to his death allegedly in connection with his employment was admissible. Travelers Ins. Co. v. Blazier, 228 S.W. 2d 217; Texas Em. Ins. Ass'n. v. Bauer, 128 S.W. 2d 840, writ of error dismissed; William v. Texas Emp. Ins. Ass'n., 218 S.W. 2d 482, writ of error refused N.R.E.

*Bliss Daffan* and *W. B. Irwin, Jr.,* both of Houston, for respondent.

MR. JUSTICE WILSON delivered the opinion of the Court.

In this workmen's compensation case we must first decide whether there is any evidence to support a jury finding that the deceased was acting within the scope of his employment at the time of his death and then determine the admissibility of certain testimony.

The rules of law are familiar. The Court of Civil Appeals has affirmed a trial court's judgment for the claimant in an opinion reported at 250 S.W. 2d 663.

As a factual defense the carrier vigorously contended that the deceased was intoxicated, but it did not gain the point before the jury.

Deceased was a nightwatchman for the Gulf Bitulithic Company which company had a contract to construct a portion of a highway. He was alone at the time of the accident. His body was found lying close to his overturned automobile on the shoulder of the highway near a construction barricade erected to stop traffic. There is no direct proof as to what he was doing, where he was going, what his mission was, or why he was driving at the time of the accident. He was killed during working hours and upon the employer's premises.

The evidence is uncontroverted that up until a few weeks before the accident the employer had machinery stored near an

overpass on the construction job. Deceased had the duty of watching this machinery and also had the duty of watching a batching plant some distance away. The spot where he was killed lay on one route between these two places. His duties then included traveling back and forth and it was all right with the employer for him to use his car.

The "no evidence" point arises from testimony of the witness Homesley (job superintendent) that shortly before the accident a second watchman had been employed to watch the equipment in the vicinity of the overpass. The carrier contends that this testimony establishes that all of the duties of the deceased were "confined solely" to watching at the plant site.

■ The carrier also contends that the employee is bound by the testimony because the employee called the job superintendent to the stand. We may say here that where the employee calls an agent of the employer to prove rate of compensation and where the carrier on cross-examination opens up the different subject of scope of employment, the employee is not bound by the testimony on scope of employment under the rule that one calling a witness vouches for his credibility. On that point the carrier made the witness its own. Also because of the method of calculating premiums there are elements of adversity in the three-way relationship of employee - employer - carrier which would make harsh and unfair a rule requiring that all of such a witness' testimony be binding on an employee.

■ Absent the testimony of the witness Homesley, there is ample evidence to support a finding that the deceased was within the scope of his employment. He was on the employer's premises during working hours traveling a route which under his first employment he had been employed to travel.

Considering Homesley's testimony most favorably to the employee, it cannot be said that *all* of his duties were confined to the batching plant, although the contract of hire may have confined the *watching* duties solely to the batching plant. The witness testified:

"Q. Just what did you tell Mr. Wheat about his duties thereafter as night watchman?

A. I told Mr. Wheat his duties were to watch the plant site and all the equipment around the plant site from seven o'clock in the afternoon until five in the morning. That is ten hours a night.

Q. Did you tell him that Mr. Hilton had been placed in charge in guarding the equipment other than at the plant site?

A. Yes, sir; he was informed of that.

Q. Mr. Wheat was by you?

A. Yes, sir.

Q. Did you also inform or tell Mr. Wheat that after that time he wouldn't be required and you didn't want him to watch or guard the machinery down in the general vicinity of the Wye proper?

A. That's right, yes, sir.

Q. Did you tell Mr. Wheat that his duties would be confined solely to the plant site?

A. I did, yes, sir."

We do not think that testimony that the machinery to be watched was located only at the batching plant established as a matter of law that deceased could not leave the batching plant for any purpose without being outside the scope of his employment. There had been thefts from this job. A nightwatchman might need to go for help or to communicate with other nightwatchmen in connection with his work. The above testimony when considered as a whole is fairly susceptible to the construction that the duty referred to in the last question quoted was the "watching" duty. The deceased was not violating an instruction in leaving the batching plant. There is no testimony of any instructions not to leave the batching plant for any purpose. The carrier in its brief admits this:

"* * * This is not a case in which the employee has violated his employer's instructions as to the time, manner or place in which to perform his work. This is a case in which the employee has departed from the only place at which his work would be performed, thereby placing himself outside the sphere of his employment as expressly fixed by his contract of hire."

The problem becomes: Does the testimony establish as a matter of law a contract of hire requiring the deceased to remain at the batching plant and not leave it for any purpose? We think not. Homesley did not so testify. The deceased was killed on the premises during his working hours. The point is that even though uncontroverted the testimony relied on by the carrier is not so clear, unambiguous and positive as to establish as a matter of law that any leaving of the immediate area of the batching plant by the deceased for any purpose took him outside of his employment.

On the other hand, this same testimony when considered in the light of the testimony offered also on intoxication, under Sec. 1, Art. 8309, R.C.S., the physical circumstances of the accident, and in the absence of affirmative proof that the deceased was on his employer's business—this same testimony would support a jury verdict that the deceased was outside the scope of his employment. So on the proof before us the matter became a fact issue for the jury.

The carrier complains of the admission of testimony of Justice of the Peace Newsom giving the content of conversations between Newsom and the deceased.[1] In these conversations the deceased discussed with the witness the performance of the work. This was offered for the purpose of showing that his duties consisted of patrolling the highway and taking care of the flares on the highway. While most of these conversations occurred at a time prior to the change in his duties (as testified by the Job Superintendent Homesley), at least one of them was about four days before the accident. The effect of these conversations was to establish that the deceased had discussed duties with Newsom which included patrolling the road and looking after the flares on the highway. Thus the testimony of the deceased as to the scope of his employment is admitted on that issue. This is out-of-court and unsworn conversation related by the witness Newsom and offered to allow the deceased to testify through Newsom. Clearly it is hearsay testimony offered for the purpose of proving the truth the content of the out-of-

---

[1] (Excerpt from testimony of the witness Newsom)

"Q. Did you talk with him on those occasions?
A. Yes, sir. I have talked with him several times.
Q. What was the substance of the conversations you had with him?
A. Well, he would talk about the gas being missing and flares knocked off of the roads, and he said he was trying his best to prevent that. He was patrolling, too, and he said he appreciated my help, that with my help and his help we might catch some of them.
Q. Did that happen on a number of occasions?
A. Well, two or three times we had talked about those things, two or three times.
Q. Was it around about close to the time that you knew of his death?
A. I believe the last time I talked with Mr. Wheat before his death was—
*Defendant's Bill of Exception No.* ,

Mr. HIGHTOWER. Your Honor, my objection will go to all conversations?
Court: Yes, sir. I overrule the objection.
Mr. HIGHTOWER: Thank you.
A. Approximately four days before his death we had talked together.
Q. Was he on the project in his Ford then?
A. He was right around the Wye, where the Wye is now, down in here about where this black-top road is. We stopped right along here one night and talked for about five minutes. (Indicating on Plaintiff's Exhibit No. 1).

court statement. The claimant says that it was offered to prove mental state. These conversations were not made about the very trip on which he was injured and offered as declarations of his immediate purpose on that night. The mental state of the deceased on other occasions is not in issue. These conversations were offered on scope of employment.

■ The claimant also contends that these conversations were a part of the res gestae. The latest of these conversations occurred four days before the accident. They are not relevant to the happening of the accident but are relevant only on scope of employment. The employment contract had been in existence for some time. They are clearly not res gestae to the accident. Newsom might testify to what he saw and observed but not to the content of conversation. Williams v. Texas Employers Ins. Assn., 218 S.W. 2d 482. The death of the declarant of hearsay does not in itself render admissible testimony which would otherwise be excluded. McCormick & Ray, *Texas Law of Evidence,* Sec. 359, p. 447.

The admission in evidence of the conversations which occurred prior to the change of duties would not require reversal since before the change of duties the deceased was called upon to ride back and forth between the overpass and the batching plant. However, it is clearly established that the last conversation occurred only four days before the accident and was offered to prove that *at that time* the deceased said his duties included patrolling the highway and watching the flares. It amounts to the deceased testifying that his duties were not confined to the batching plant. On the point of watching flares and patrolling the highway, it is directly in conflict with other testimony of Homesley.

■ Since scope of employment was the vital issue on which the case was fought, and since there was so little direct evidence on this point other than the testimony of the witness Homesley, we have concluded that the jury probably gave Newsom's hearsay testimony controlling effect. Considered from the carrier's viewpoint, there was a clear conflict between Homesley's testimony and the hearsay declarations proved through Newsom. The jury must reject one or the other. Newsom, whose credibility was not under attack, was a local public official having no interest in the outcome of the trial and his testimony was calculated to carry weight with the jury. If the jury let their decision turn upon hearsay testimony, their verdict was of course improper.

Under these circumstances it is our opinion that his hearsay testimony was reasonably calculated to cause, and probably did cause, the rendition of an improper verdict.

Due to possible changes in the circumstances of the claimant between trials and therefore the probability that the evidence on lump-sum settlement will not be the same on a second trial, we have not considered the carrier's point III. It is not necessary that we consider points IV on improper argument.

Accordingly the judgments of the trial court and that of the Court of Civil Appeals are reversed and the cause is remanded to the trial court for another trial. Rule 503, T.R.C.P. Costs are taxed against respondent.

Opinion delivered February 18, 1953.

Associate Justices Garwood and Culver not sitting.